(Decided April 8th, 1897).

---

## ALCAEUS HOOPER, Mayor of Baltimore City, *vs* HENRY F. NEW.

*School Commissioners of Baltimore City—Election by Convention of the City Council Without Nomination by the Mayor—Ratification of Municipal Ordinance by the Constitution—Mode of Appointing Municipal Officers—Vacancies in Office—Mandamus—Effect of Sustaining Demurrer to Answer.*

The ordinance of Baltimore City providing for the appointment of School Commissioners by a joint convention of the two branches of the City Council is valid, and these Commissioners are not within the purview of the Local Code, Art. 4, sec. 30, which requires that municipal officers shall be appointed by the Mayor by and with the advice of the City Council.

The mode of appointing municipal officers in Baltimore City prescribed by Local Code, Art. 4, sec. 30, does not apply to the appointment of subordinate employees or laborers.

Under the charter of Baltimore City (Local Code, Art. 4, sec. 30), all the officers of the corporation, with certain exceptions, are required to be appointed by the Mayor with the advice and consent of the two branches of the City Council. An ordinance of the city, passed in 1828, provided that the School Commissioners should be chosen by the two branches of the Council in joint convention. The Constitution of 1864 (Art. 8, sec. 3), provided that the Commissioners should be appointed "as at present," subject to such alterations as might be made by the Legislature or the Mayor and City Council. An ordinance passed in 1866 increased the numbers of School Commissions and provided for details of school management, but also directed that the Commissioners should be elected by the Council in joint convention, and this mode of appointment has continued ever since. The Constitution of 1867 provided that the laws and ordinances relating to Baltimore City should be continued until changed in the due course of law. That Constitution also declared that the then existing system of public schools should continue in force until the end of the session of the Legislature of 1868, and then expire except as continued by that Legislature. The Act of 1868, chap. 407, made provision for the establishment of a general system of public schools throughout the State, and gave to the Mayor and City Council of Baltimore *full* power to establish the system in that city, but made no provision for the appointment of School Commissioners. The appellee was elected a School Commissioner by a convention of the two branches of the City Council, but the appellant, Mayor of the city, refused to administer to him the oath of office, alleging that the ordinance under which the appellee was appointed was void because in conflict with the above cited provision of the charter by which nomination by the Mayor was made necessary for the appointment of officers. Upon a petition by the appellee for a *mandamus*, it was *Held*, assuming without deciding that the School Commissioners are municipal officers and not agents of the State, ,

1st. That the Constitution of 1864 ratified the then existing method of appointment prescribed by ordinance and provided that the same method should be continued unless changed, and thus the appointment of School Commissioners was made an exception to the mode of appointment of municipal officers generally.

2nd. That the Constitution of 1867 continued in force the then existing ordinance of 1866 providing for the appointment of the Commissioners by joint convention, and likewise made their mode of appointment an exception to the general rule.

3rd. That the thing which the Constitution of 1867 continued in force was not merely the formal ordinance then upon the books regulating the School Board, but the power which authorized the municipality to adopt that method of electing the Commissioners, and the subsequent repeal and re-enactment of the ordinance, but with the same provision as to the mode of appointment was not a surrender of such power.

4th. That the Act of 1868 did not affect the existing ordinance relating to the appointment of School Commissioners in the city, but carried the same into the new system established under the Constitution of 1867.

5th. That the Act of 1868 gave to the city the whole of the State's power over public schools there, and under it any mode of appointment which the Legislature might have prescribed was given to the city, and that Act continued in the city all the powers it previously possessed concerning the method of appointing School Commissioners.

6th. That since there has been no subsequent ordinance or statute providing for a different mode of appointing Commissioners, the appellee, having been duly elected by a joint convention of the Council, is entitled to the office.

An ordinance requiring the City Council to be officially informed when a vacancy occurs in an office is not applicable to a case where the term for which an officer was appointed has expired ; and a successor may then be lawfully elected without any official notification of the expiration of the term of office.

An answer filed to a petition for a *mandamus* was demurred to, the demurrer sustained and an order passed directing the writ to issue. *Held*, that this mode of procedure was proper. It was not necessary in such case to offer evidence in support of the allegations of the petition because the facts upon which the questions of law arose were admitted; and the order was not passed by default for want of an answer, nor were the allegations of the petition taken *pro confesso*.

Appeal from an order of the Baltimore City Court (WICKES, J.), by which it was " adjudged and ordered that the demurrer of the petitioners to the answer of the defendants be and the same is hereby sustained. And it is further adjudged and ordered that a peremptory writ of *mandamus* issue at once against the defendant, Alcaeus Hooper, Mayor of Baltimore City, as prayed, commanding him to administer the oath of office as prescribed by law, to the petitioner, as a duly elected member of the Board of Commissioners of Public Schools of Baltimore City, and to deliver to him a good and sufficient commission as such Commissioner of Public Schools."

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS, BOYD and RUSSUM, JJ.

*Thomas G. Hayes, City Counsellor,* and *Thomas Ireland Elliott, City Solicitor,* for the appellant.

I. *The appointment prior to the Constitution of 1864 of School Commissioners for Baltimore City by a joint convention of the City Council, without any participation in such appointments by the Mayor, was ultra vires and void.*

The first delegation of the power to the Mayor and City Council of Baltimore in the matter of public schools was by the Acts of 1825, ch. 130, and 1825, ch. 162, section 21. The former Act provided " That the Mayor and City Council of Baltimore shall have power to establish public schools within the city of Baltimore." The delegation of the power in the latter Act was substantially the same as above given. The Mayor and City Council of Baltimore under this power passed ordinance No. 19, 1828, which provided that the School Commissioners " shall be chosen by the two branches of the City Council in convention." The Mayor having no voice in their selection. This mode of the exercise of the power conferred on the municipality by the Act of 1825 was clearly *ultra vires* and void. *Hooper* v. *Creager,* 84 Md. 195.

II. *The Constitution of 1864 ratified this illegal mode of appointment of School Commissioners for Baltimore City, and gave it validity so long as that Constitution continued in force, but no longer.* By Article 8, section 3 of the Constitution of 1864, it was provided as to the School Commissioners that they " shall remain as at present constituted, and shall be appointed as at present by the Mayor and City Council, subject, &c." This Court has held that the legal effect and operation of this claim was to give legality to the then existing mode of appointment, which under ordinance No. 19, 1828, and subsequent ordinances, was by the City Council in joint convention. *School Com.* v. *State Board,* 26 Md. 516.

The Act of 1865, ch. 160, was passed while this constitutional provision was in force, but had no provision in it as to the mode of appointment of the School Commissioners

for Baltimore City, hence the legality of this mode of appointment during the existence of the Constitution of 1864, depends solely on this provision of the organic Act.

III. *The adoption of the Constitution of 1867 repealed the Constitution of 1864; and the provisions of Article 8, section 3 of Constitution 1864, which had legalized this mode of appointment by the City Council by virtue of the Constitution of 1867 and the Act of 1868, ch. 407, ceased to have any legal efficacy.* The effects of the adoption of the Constitution of 1867 was to abrogate and repeal the Constitution of 1864. This Court has said in speaking of the effect of the adoption of the Constitution of 1867: " The law repealed is abrogated and annulled and is regarded as if it never existed. *   *   *   *   The same principle applies to the repeal of a State Constitution, which is the organic law." *Smith* v. *Davis,* 28 Md. 257.

In two of the Articles (11 and 8) of the Constitution of 1867, there are provisions which require consideration as to their legal effect on the ordinance of 1828, which had as to the mode of appointment been re-enacted by the ordinance of 1866.

1. Article 11, section 8 of the Constitution of 1867, provided that " all laws and ordinances now in force and applicable to Baltimore City, not inconsistent with this Article, shall be and they are hereby continued until changed in due course of law."

It will be contended that as the ordinance of 1866 providing for the appointment of School Commissioners by the City Council in joint convention without participation by the Mayor, was in force upon the adoption of the Constitution of 1867, the above provision continued it in force until changed by law. The answer to this contention is manifold.

(*a.*) It is denied that the ordinance of 1866 was in force, because the only thing which gave force or vitality to that ordinance was the defunct clause of the Constitution of 1864, which having been repealed carried with it all ordinances which depended on it for vitality.

(*b.*) The ordinance of 1866 was inconsistent with the Act of 1817, which provided that all municipal officers should be appointed by the Mayor and City Council, and as that law was given full force by the same Article, an ordinance which depended solely for its legality on a clause of the repealed Constitution of 1864 and which was in conflict with the Act of 1817, was inconsistent with Article 11 of the Constitution of 1867.

(*c.*) In another section of Article 11 of the Constitution of 1867, it was expressly provided that the Mayor of Baltimore City should have all the power then conferred on him by law. The Act of 1817 expressly conferred the power and right of participation in all municipal officers on the Mayor. Could an ordinance which existed legally, solely by reason of the repealed clause of the Constitution of 1864 and which was in the teeth of the Act of 1817, be said to be consistent with Article 11 of the Constitution of 1867?

2. Article 8, section 2 of the Constitution of 1867, provided that the then existing system of public schools should continue in existence until the end of the next Legislature, "and shall then *expire* except so far as adopted or continued by the General Assembly."

It may now be conceded for the sake of the argument that the provisions of Article 11 continued in force the ordinance of 1866 as to the mode of appointment of School Commissioners for Baltimore City, and the question is presented did the Act of 1868, ch. 407, which was the law relating to the public schools, which was passed under the Constitution of 1867, "*adopt and continue*" the mode of appointment of School Commissioners as prescribed in the ordinance of 1866, and which was in conflict with the terms of the Act of 1817.

The Act of 1868, ch. 407, delegated the power to the Mayor and City Council of Baltimore in the following language: "The Mayor and City Council of Baltimore shall have full power and authority to establish in said city a system of free public schools, &c."

It is to be noted that this is almost the exact language of the Act of 1825, ch. 130, heretofore cited.

(*a.*) It is to be noticed that the constitutional mandate declares that the then existing system, which included the appointment of School Commissioners for Baltimore City by the City Council, should "*expire*" unless the General Assembly "adopted or continued" it. Does this not require some affirmative action by the General Assembly? Can you by inference or implication say an Act adopts or continues an existing system when there is not one word in it as to the existing system?

(*b.*) Can it be successfully contended that the Act of 1868, ch. 407, which simply delegates the whole power as to the public schools to the Mayor and City Council, has by this bare delegation of power repealed the Act of 1817, which required all appointments to be made by the Mayor and City Council?

(*c.*) The delegation of the power to the Mayor and City Council of Baltimore in the matter of the City Collector was in almost identical terms with the Act of 1868, and yet this Court in emphatic words declared that the appointment of a City Collector must be by the Mayor and City Council and not by the City Council alone. *Hooper* v. *Creager*, 84 Md. 195.

*Charles Marshall* and *John Prentiss Poe*, for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

The appellee was appointed by a joint convention of the two branches of the City Council, one of the School Commissioners of Baltimore City, pursuant to the provisions of *Art. 44 of the City Code of 1893.* The ordinance therein contained makes provision for the appointment of School Commissioners of the city by a joint convention of the two branches of the Council. When the appellee presented himself to the Mayor to have the oath of office administered by the Mayor, the latter refused to administer the oath and

placed his refusal on the ground that the appellee had not been legally appointed. The Mayor maintained that the appointment was illegal because the ordinance under which it had been made was *ultra vires* and void. And it was insisted that the ordinance was *ultra vires* and void because it is in conflict with *section 30 of Art. 4 of the Code of Local Laws.* That section is in these words : " They (the Mayor and City Council) may pass ordinances regulating the manner of appointing persons to office under the corporation, which they are or may be authorized by law to appoint, but unless such ordinance be passed the Mayor shall nominate, and by and with the advice and consent of a convention of the two branches of the City Council, shall appoint all officers under the corporation, except the Register of the city and the clerks employed by the city or under its authority, &c." Upon the refusal of the Mayor to administer the oath of office to the appellee, he made application by petition to the City Court for a writ of *mandamus* to compel the Mayor to administer the oath. To this petition the Mayor filed an answer relying upon the alleged illegality of the appellee's appointment by reason of the asserted invalidity of the ordinance. To this answer the appellee demurred ; the Court sustained the demurrer and ordered the writ to issue. From that order this appeal was taken by the Mayor.

The paramount question involved is whether the ordinance under which the appellee was appointed a School Commissioner of Baltimore City is valid or *ultra vires* and void ; and this question is presented and brought up directly on the face of the record.

The question at issue arises, it is claimed, under the same section of the Code of Local Laws that was before us in the *Hooper and Creager case* recently decided by this Court (84 Md. 195). There is, however, a clearly defined line of distinction between that case and many other cases that might arise under the same section, and which, if they did arise, it has been supposed, would be covered and controlled by

that decision; but in spite of this distinction there appears to be some misunderstanding as to the scope and effect of the Court's opinion in that case, and there also exists an impression that it is conclusive of the issue here involved. In *Hooper and Creager* we were dealing with the case of a municipal *officer*, distinctively and confessedly such, the method of whose appointment was prescribed by a designated section of the Local Code, and with that section the ordinance under which Mr. Creager had been appointed was asserted to be in conflict. We did not have before us and therefore did not pass upon the case of a subordinate employee or laborer or other like inferior servant, whose selection, in the very nature of things, was never designed or intended to be, and in fact is not, embraced within the terms of the statutes embodied in *sec. 30 of Art. 4 of the Local Code*. And as we had no such question to decide we deemed it wholly unnecessary to step aside a single pace from the straight path before us, and declare what particular appointments were *not* included within the scope of our decision. The duty of a Court is done, as we apprehend, when it decides the case before it, and it is obviously no part of that duty to declare that the Court has *not* decided something wholly different; or to enumerate, in anticipation of possible future contests the instances in which, by reason of a difference of facts, the opinion would not be applicable. The language which a Court employs, the reasoning which it resorts to for the purpose of disposing of a particular question ought not to be wrested from the context and the occasion, and strained so as to be made pertinent or seemingly pertinent to some other distinct and dissimilar question. But this is frequently done incautiously, and some persons are by that erroneous process led to suppose that results are established by a judicial opinion, though those results do not logically follow from it at all. There may be sometimes an apparent similarity between cases; but it ought not to be forgotten that mere similarity is not identity. It is a common fallacy, this inference that a conclu-

sion is universally and under all conditions, sound, because it is sound in a particular instance and under peculiar circumstances. It does not follow that a conclusion which is true *secundum quid*, or in a certain respect, is also true *simpliciter*, or simply and absolutely.

In the *Creager case* we were dealing with an ordinance regulating or attempting to regulate the manner of appointing persons " to office "—to a municipal office—and not with an ordinance regulating the method of employing or appointing servants or laborers and kindred subordinates, who are in no sense *officers* of the municipality at all, but are merely and essentially employees. Consequently the language used in the opinion in that case must be understood as applicable to municipal *officers*—the class of persons designated in *sec. 30 of Art. 4*—as contradistinguished from mere employees. Nor does the *Creager case* touch upon or involve the specific point now presented. *If* the School Commissioners *are municipal officers*, and *if* there had not been any legally prescribed mode provided for their appointment other than that contained in *sec. 30, Art. 4*, which applied to Mr. Creager's appointment, then, undoubtedly the mode of selecting School Commissioners would be within the reason, and, therefore, within the effect and operation of the decision in the *Creager case*. But it is right here that the *Creager case* and this case diverge. It is precisely because *sec. 30 of Art. 4* does *not* apply to School Commissioners any more—though for a different reason—that it applies to a bailiff in the Tax Collector's office, an employee under the City Commissioner or hundreds of other subordinates in the service of the city, that what was said in *Creager and Hooper* can have no influence upon the decision of this case.

If it be assumed, though it is by no means conceded (and certainly it is not now decided), that the School Commissioners are municipal officers, as contradistinguished from agents of the State selected by the municipality under power delegated by the State, to carry on within the limits

of the city the beneficent purposes of the general school
system of the commonwealth—just as a State Tax Col-
loctor in a county is an officer of the State, though selected
by the County Commissioners—still the predominant prop-
osition that their appointment does not fall within the terms
of *section 30 of Art. 4 of the Local Code,* remains to be
demonstrated.   If their appointment does not fall within
that section we have no further need or occasion to allude
to the *Creager case* hereafter in this opinion.

Now, what is the method provided for the appointment of
the School Commissioners of Baltimore City, and under
what authority was the method adopted?   The *Local Act
of 1825, ch. 130,* declares: "That the Mayor and City
Council of Baltimore shall have power to establish public
schools within the city of Baltimore;" and *section 21 of
chapter 162 of the General Laws,* passed at the same session
of the Legislature, vested in the Mayor and City Council
the authority to establish and regulate the public or pri-
mary schools of the city.   Under these statutes and pur-
suant to their design, an ordinance was passed by the mu-
nicipality in eighteen hundred and twenty-eight, by which it
was, amongst other things, provided that the Commissioners
of Public Schools should be chosen *by the two branches of the
City Council in convention;* and this prescribed method thus
specifically fixed by that and by subsequent amendatory
ordinances, apart from being recognized by the *Act of 1845,
ch. 120,* was fully and completely ratified, sanctioned and
validated afterwards—even if antecedently invalid—by the
organic law of the State; for by section 3 of Article 8 of
the Constitution of 1864 it was expressly ordained that:
"The School Commissioners of Baltimore City shall *remain
as at present constituted* and *shall be appointed as at present,*
by the Mayor and City Council, subject to such alterations
and amendments as may be made from time to time by the
General Assembly or the said Mayor and City Council."
It should be noted that this constitutional provision pre-
scribed two things.   *First.* It declared that the School

Commissioners of the city should remain as then constituted and *secondly*, looking to the future, it ordained that they should afterwards " be appointed as at present," that is, in the mode then existing. The Constitution of 1864, therefore, not only ratified the then subsisting method of appointment, but provided that the *same* method, viz., by a joint convention of the two branches, should thereafter be pursued, unless changed or altered by the General Assembly or by the municipality. It seems too clear for serious controversy that when the Constitution of 1864—the Supreme law of the State—provided that the School Commissioners should be appointed in the method then pursued, that is, pursued under the ordinance of 1826, as repeatedly re-enacted, it distinctly sanctioned the appointment by a convention of the two branches of the City Council, for that was the sole method *then* in force and then followed; and however other officers of the municipality might have been required to be selected under the Acts of 1817 and 1828, which formed *sec. 25 of Art. 4 of the Local Code of 1860*, and which now form. *section 30 of Art. 4, Local Code of 1888*, these appointees—the School Commissioners of the city were not. within the terms or the scope of the Local Code; and *their* appointment was provided for by a totally different and wholly distinct method. Whilst under the *Act of 1865, ch. 160*, which established, pursuant to the mandate of the Constitution of 1864, a general public school system throughout the State, the primary schools of the city were brought under and in a measure moulded into that system itself; still that statute did not strike down the entire autonomy of the local schools, but left the *mode* of selecting the School Commissioners for the city, as fixed by the ordinance of 1828, precisely where the Constitution of 1864 had uequivocally placed it, in a joint convention of the two branches of the City Council. This in substance and effect our predecessors determined in *School Coms. of Baltimore* v. *State Board of Education*, 26 Md. 505.

In eighteen hundred and sixty-six another ordinance was

adopted by the Mayor and City Council, whereby the number of School Commissioners was increased to twenty, and whereby numerous details of the local system were prescribed ; but no change whatever was made in the mode of appointing the Commissioners. So far from a change being made, the identical method prescribed by the old ordinance of 1828, viz., a selection by a joint convention of the two branches of the City Council was in terms specifically re-enacted. This ordinance of eighteen hundred and sixty-six, passed at the very time that *sec. 25 of Art. 4 of the Local Code of 1860* (which is practically identical with *sec. 30, Art. 4* of the present Local Code as transcribed in the beginning of this opinion), was in force, was clearly such an ordinance as the municipality had the power, under the broad terms of sec. 3, Art. 8, of the Constitution of 1864, to enact ; for it was, in so far as it related to the mode of making the appointments of the City School Commissioners, simply a reiteration of the provisions of the ordinance of 1828 as frequently amended and re-enacted. It cannot be doubted that the Mayor and City Council had the unquestionable power under the Constitution of 1864 to pass the ordinance of 1866, inasmuch as the Act of 1865 made no provision whatever for the appointment of City School Commissioners, and inasmuch as there was no other law that did. At the very time this ordinance of 1866 was adopted, and validly adopted under the plenary power conferred by the Constitution of 1864 upon the municipality, the identical law (*sec. 25, Art. 4, Local Code 1860*), under which, as contained in *section 30, Article 4, Local Code of 1888*, it is now claimed the School Commissioners *must* be nominated by the Mayor and by and with the advice and consent of a joint convention, appointed, was in full force and vigor. Still, assuming as we have throughout, that a School Commissioner is a municipal officer, it can scarcely be contended that the method of selecting School Commissioners, first resorted to in 1828 (but whether rightfully *then* or not is wholly immaterial, because it was afterwards

unequivocally sanctioned by the organic law in 1864)—it can scarcely be contended, we repeat, that this method was not an *exception* to the general mode provided by the Local Code for the appointment of other municipal officers. It was an exception created by an ordinance in 1828, and that ordinance was given the force of law by the Constitution itself, and the ordinance not having been changed in this particular—respecting the *mode* of appointment—by the ordinance of 1866, but being re-enacted by the latter, it obviously continued to have the same force and efficacy which the Constitution imparted to it, unless the mere abrogation of the Constitution of 1864, and its being superseded by a later one, has deprived the ordinance of its vitality. When the ordinance became obligatory by force of the Constitutional provision alluded to, how could the adoption of a new Constitution, without more, take away the character antecedently given to the ordinance? But it is needless to speculate upon this subject, because there is a most conclusive reason for holding that the adoption of the Constitution of 1867 did not destroy or impair the efficacy of the ordinance of 1866.

The Constitution of 1867 contained a separate Article pertaining to Baltimore City, and amongst the provisions therein set forth is section eight, whereby it is declared that " all laws and *ordinances now in force* and applicable to Baltimore City, not inconsistent with *this Article*, shall be and they are hereby *continued* until changed in due course of law." Here, then, in the most formal and explicit terms, is a declaration that " all ordinances now in force * * * shall be and they are * * * *continued* until changed in due course of law." The ordinance of 1866 providing for the appointment of School Commissioners by a joint convention of the two branches of the City Council was undeniably *then* in force ; it was applicable to the city of Baltimore and to that city alone, and it was not inconsistent with Article eleven of the Constitution which related to Baltimore City. Was not that ordinance, then, and the power

conferred by it, necessarily *continued* in force, "until changed
in due course of law?" There can be, it seems to us, but
one answer to that question; and it is, that the ordinance
was incontestably continued in force, and the power it gave
was unmolested by the Constitution of 1867. If continued
in force, as it certainly was, it provided, and lawfully pro-
vided, after the abrogation of the Constitution of 1864, a
separate method for the appointment of School Commis-
sioners, essentially and materially different from the method
prescribed in and by the Local Code for the appointment of
city officers; and it remained as it had originally been an
*exception* to the other or general mode. The same section
of the Constitution of 1867 which continued the ordinance
of 1866, not by name or number, it is true, but because it
was an ordinance *then* in force, also continued the laws ap-
plicable to appointments generally, and, consequently, the
Constitution left both systems of appointment as it found
them, side by side—the one pertaining to a particular class;
the other and different one affecting distinct classes. The Con-
stitution of 1867 not only continued this ordinance in force;
but it continued it and the power that it gave, "until changed
in due course of law;" and this phrase obviously means
that the ordinance in question was to remain effective by
virtue of the constitutional mandate, and the power that it
conferred was to subsist until repealed by the municipality,
or until overridden or superseded by subsequent legislative
enactment. By no right reasoning can it be held that the
very section of the Constitution which expressly continued
the ordinance of 1866, at the same time repealed it by also
continuing in force the law providing a different method for
the appointment of other officers. If the ordinance relating
to the appointment of School Commissioners and the stat-
ute relating to appointments generally were flatly contra-
dictory, the continuation of *both* of them in force by the very
same clause of the Constitution of 1867, could cause neither
to be a repeal of the other, but would constitute the one—
the particular method—an exception to the other—the gen-

eral method. The change by due course of law, which was contemplated by the Constitution, was a change not made by the Constitution itself or as a result of its adoption ; but was to be some subsequent action taken either by the Mayor and City Council or by the General Assembly.

Has, then, the ordinance of 1866 prescribing the method of appointing School Commissioners been " changed in due course of law ?" The ordinance has been repeatedly repealed and re-enacted, but there has been no change made in the method of selecting the Commissioners. The *thing*, the substance, which the Constitution of 1867 continued in force was not merely the formal ordinance couched in particular words, but the *power* which that ordinance contained authorizing the municipality to follow this special method of making these selections ; and until some other *method* is adopted, if that one has not been repealed, the same *power* necessarily continues, notwithstanding changes by the repealing and re-enacting ordinances in other particulars. So long as the *power* has not been surrendered by the adoption of some valid inconsistent ordinance or taken away by the passage of some Act of Assembly, it remains ; and its exercise by the enactment of subsequent ordinances later in date than that of 1866, but all reasserting the same power, is conclusive as indicating that the power itself has not been stripped from the municipality by any act of the Mayor and City Council. There is nothing in the legislation by the city authorities that has abridged this power in the least ; and it remains to be seen whether there is any constitutional provision or any Act of Assembly that impairs it.

The Constitution of 1867, by Article eight, provides for the establishment of a thorough and efficient system of free public schools throughout the State, and in obedience to that requirement the General Assembly of 1868 enacted an elaborate statute on that subject. Amongst other things it was prescribed by the statute that " The Mayor and City Council of Baltimore shall have full power and authority to establish in said city a system of free public schools under

such ordinances, rules and regulations as they may deem fit and proper to enact and prescribe ; they may delegate supervisory powers and control to a Board of School Commissioners ; may prescribe rules, &c." *1868, ch. 407, subch. 7, sec. 1.* Other sections follow defining the power of the School Commissioners and authorizing the municipality to levy taxes for the support of the schools. By sec. 6 of the same Act, and the amendment of it by the *Act of 1892, ch. 341*, the method by which the School Commissioners of the several *counties* are to be appointed, is specifically prescribed ; but no where in the *Act of 1868, ch. 407*, as originally passed, or as codified in *Art. 77* of the Code, or as since amended, is there a single word designating the mode to be pursued in the appointment of the School Commissioners of Baltimore *City.* Is, then, the delegation to the municipality of the power to establish in the city of Baltimore a system of free schools—which system was to be a part and parcel of the general system—to be taken as a repeal of the *power* to select the Commissioners in the manner that was manifestly lawful at the time the Act of 1868 was passed ? A valid mode of making appointments of School Commissioners in the city existed when the Act of 1868 was adopted. That Act made provision for no other method as respects Baltimore City, though it did establish a mode for the several counties ; and by its *2nd* and *9th* sections it repealed only such general and local laws as were inconsistent with its provisions. Now, obviously, the Act of 1868 having made *no* provision, in direct and unequivocal terms, for the mode of appointment of School Commissioners in Baltimore, there is nothing in that Act inconsistent with the antecedent ordinance of 1866 and the *power* contained in that ordinance ; and it irresistably follows that the Act in no way impaired the validity of the ordinance or took away the right to exert the *power* it conferred, unless it be assumed that a failure to provide, specifically and in direct terms, a mode of appointment for the city whilst distinctly prescribing a method for the counties, was tantamount to an abrogation of all prior legislation on the subject.

But the second section of Article eight of the Constitution of 1867 declared that the system of public schools as then existing under the Constitution of 1864 and under the Act of 1865, should remain in force until the end of the session of the General Assembly of 1868 ; " and shall then expire except so far as adopted or continued by the General Assembly." Now, the system in force when the Constitution of 1867 went into effect contained no provision for the appointment of School Commissioners in Baltimore, apart from those of the ordinance of 1866 which had been continued in force as already pointed out. If this feature of the school system relating to the appointment of School Commissioners in the city was not adopted or continued by the provisions in the *Act of 1868, ch. 407*, which gave to the Mayor and City Council full power and authority, precisely as they had possessed it before, to establish schools in the city; or was not retained by the continuance in force under the Constitution of 1867 of the ordinance of 1866 ; then there is not, and since 1868 there has not been in existence, any clause or section of the school law or of the city ordinances relating to schools, making provision for the method of selecting School Commissioners in Baltimore City. The delegation of the whole subject to the city, without restriction, was a delegation to the city of exactly the authority it had had before, as that authority had been defined and interpreted by the previously existing organic law. The effect of the Act of 1868 was to place the city, in respect to the public schools, just where it had been, and to clothe it with identically the powers it had possessed antecedently ; and, therefore, the Act, coupled with the continuance in force of the ordinance of 1866, clearly carried the provisions of that ordinance, and the power that it gave, into the new system established under the Constitution of 1867, as a component part of that system ; and consequently the ordinance did not expire. Let us state this another way : Under the school system created by the Constitution of 1864 and the Act of 1865, the power of a joint convention

of the two branches of the City Council to appoint School Commissioners was indisputable ; but that power had not been conferred by the Act of 1865, for it existed independently of that statute altogether. The source of the power is to be found anterior to the adoption of the ordinance of 1866—but we need go no farther back—and that ordinance, aside entirely from its relation to the public schools of the city, was continued in force by the Constitution of 1867, because it was an ordinance actually in force when the Constitution was adopted, and was not inconsistent with any constitutional provision relating to the city. When the new school system of 1868 was enacted, and the same general and broad powers were given by it to the city that the city had had under its own old system—for that was undoubtedly the effect of *sec. 1, sub-ch. 7, ch. 407, Acts 1868*, heretofore quoted—the antecedent power to make appointments of the School Commissioners, and to make *those* appointments in the manner they had previously been made, was not taken away or disturbed ; and if not taken away or disturbed it was, under the comprehensive terms of the Act of 1868, necessarily continued. The Legislature did not mean in giving full and plenary power to the city, to strip the city at the very same instant of a part of the power which the city already had. Such a proceeding would have been flatly contradictory. In giving *full* power the Legislature neither gave *less* power than then existed, nor curtailed the methods by which the power actually given could have been or may still be exerted. It is difficult to perceive how the delegation to the city by the Legislature of *full* power to establish schools could possibly have operated to deprive the city of some portion of the power it confessedly possessed on the same subject, at the very moment the Act so delegating such plenary power became effective. To rescue the city school system from the conditional repeal which section second of Article eight of the Constitution of eighteen hundred and sixty-seven contemplated—for that section declared, as already stated, that the system established by the Constitu-

tion of 1864 and under the Act of 1865, should expire at
the end of the next session of the General Assembly unless
adopted or continued by the Legislature—the Legislature
did, by the *Act of 1868, ch. 407*, what was clearly equiva-
lent to a literal re-enactment of every provision of the then
operative statutes and ordinances relating to public schools
in the city; because it gave to the city in the most liberal
and unqualified terms *full power* over the whole subject,
that is, precisely the same power which the State herself
possessed; and in the face of this it can scarcely be asserted
that *full* power was intended or can be interpreted to imply
a power far more restricted, narrowed and limited than the
antecedent power admittedly possessed by the city.    It can-
not be denied that it was entirely competent to the Legis-
lature to provide that School Commissioners should be ap-
pointed by a joint convention of the City Council.    But the
Act of 1868 gave to the city for the purpose of enabling it
to successfully carry on the public schools the whole of the
State's power on that subject, coupled, of course, with an
inalienable right on the part of the State to modify or re-
peal; and, hence, any mode of appointment which the Leg-
islature might lawfully have prescribed was of necessity
given by the Act of 1868 to the city; and if this be so, then
that Act incontestably *continued* in the city *all* the powers
which the city formerly had, respecting the method of ap-
pointments of School Commissioners, as well as in regard to
prescribing the length of the Commissioners' term of holding.

As, then, the ordinance of 1866 remained in full force
after the adoption of the *Act of 1868, ch. 407*, the appoint-
ment of School Commissioners in Baltimore continued to
be made under the provisions of that ordinance.    We find
nothing in either the municipal legislation, or in any enact-
ment of the Legislature, or in any constitutional provision,
which took away or interfered with the power that the two
branches of the City Council in joint convention possessed,
to select the School Commissioners of Baltimore City.

If conditions have arisen and now exist, which indicate

that this method of appointment, followed, as it has been, for the past sixty-nine years uninterruptedly and unchallenged, no longer promotes the efficiency of the public schools in the city of Baltimore; the Mayor and City Council or the General Assembly may by ordinance or by statute sweep it away and substitute some other in its stead; but Courts of Justice, whose sole province it is to declare what the law is, have no jurisdiction or authority to disturb it.

It has, however, been objected that the appointment of the appellee was irregular, because " no vacancy existed in the ward for which he claims to have been elected;" and " that the ordinances requiring the City Council to be officially informed of any such vacancy were not observed." This defence set up by the eleventh paragraph of the answer cannot be of any avail. Mr. New was not selected to fill a *vacancy*. His predecessor, the School Commissioner from the Twenty-first Ward, had been selected in February, 1893, for the full term of four years; and when that term expired it became the duty of the City Council to elect a successor. The ordinances did not impose upon the City Council an obligation to wait until informed by the Mayor that the term of the then incumbent had expired or was about to expire, before they could lawfully proceed to elect another Commissioner from the same ward. Their own records advised them of the dates when the terms of the School Commissioners would end; and as the ordinances upon which reliance is placed in this particular relate only to cases where vacancies occur, and as by the eleventh clause of the answer it is admitted that no vacancy did exist, these ordinances, thus relied on, obviously have no application, and certainly furnish no reason or cause which impugns the regularity of the appellee's appointment.

There was no issue of fact raised that should have gone to a jury, and hence no error can be predicated of the order appealed from, because it was passed without sending the case to a jury for trial.

We do not perceive any thing tenable in the objection that the writ was ordered to be issued after the demurrer to the answer was sustained and without proof to support the allegations of the petition.    In *Legg's case*, 42 Md. 203, the answer was quashed and there was then and thereafter no answer whatever in the case ; and this Court held that " in the absence of an answer the Judge is required to *hear* the case *ex parte*, that is, to allow the applicant to produce his proof, to satisfy the mind of the Judge that the allegations of the petition are founded in truth." . In *Miles' case*, 82 Md. 142, the petition for the writ was demurred to, and upon the demurrer being overruled the writ was issued. This we held to be error for the reason given in *Legg's case*.    There was no answer filed at all, and the statute does not authorize the averments of the petition to be taken *pro confesso*, nor an entry of judgment by default for the want of an answer.    But there is no such condition presented by this record.    Here, in this case, an answer was filed and to that answer a demurrer was interposed by the relators. The demurrer admitted all the facts set up in the answer and raised purely and simply a question of law ; and that question was whether, conceding every fact averred in the answer to be true, a valid legal ground was shown against the issual of the writ.    The answer is still in the case.    The sustaining of the demurrer did not strike out the answer as a successful motion to quash it would have done.    The facts upon which the question of law arose were admitted and the order directing the writ to be issued was not passed by default for the want of an answer, nor because the allegations of the petition were taken *pro confesso*, but because the naked legal question presented by the petition and the answer was determined adversely to the respondent.    This is precisely the mode of procedure followed in *County Coms.* v. *Banks*, 80 Md. 321, and has been expressly determined by this Court to be proper and permissible.    The exact point has been ruled in *Hardcastle* v. *M. & D. R. R. Co.*, 32 Md. 32 ; *Barney* v. *The State*, 42 Md. 480.

The views we have expressed are conclusive of every question that affects the merits of the controversy ; and as we agree entirely with the results reached by the learned and accomplished Judge who decided this case below, his judgment upholding the validity of the ordinance under which the appellee was appointed, and declaring that appointment valid, must be affirmed.

*Order affirmed with costs.*

(Decided April 8th, 1897).